UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Nº 16-CV-4660 (JFB)
_____

BRIAN SCOTT BARRETT,

Plaintiff,

VERSUS

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____

**MEMORANDUM AND ORDER**
February 14, 2018
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Brian Scott Barrett commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying plaintiff's application for Social Security Disability benefits. An Administrative Law Judge determined that plaintiff had the residual functional capacity ("RFC") to perform light work, with certain exertional and nonexertional limitations; that there were a significant number of jobs in the national economy that plaintiff could perform; and that, therefore, plaintiff was not disabled. The Appeals Council denied plaintiff's request for review of the ALJ's determination. Accordingly, the ALJ's determination became the Commissioner's final determination.

Plaintiff now moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Plaintiff argues that: (1) the ALJ did not afford adequate weight to the medical opinions of plaintiff's treating physician, Dr. Dowling; (2) the ALJ's determination that plaintiff had the RFC to perform light work was not based on substantial evidence; (3) the ALJ failed to properly evaluate plaintiff's credibility; and (4) the Commissioner failed to sustain her burden of establishing that there is other work in the national economy that plaintiff can perform. Plaintiff requests that the Commissioner's decision be reversed and

the Court remand the case with instructions to award benefits. In the alternative, plaintiff requests that the Commissioner's decision be reversed and the Court remand the case for reconsideration by the ALJ of: (1) the weight given to Dr. Dowling's opinions; (2) plaintiff's RFC to perform light work; (3) plaintiff's credibility; and (4) new vocational expert testimony. The Commissioner opposes the motion and cross-moves for judgment on the pleadings.

For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

## I. FACTUAL BACKGROUND

The following summary of the relevant facts is based on the Administrative Record. ("AR," ECF Nos. 8, 12.) [1] A more exhaustive recitation is contained in the parties' submissions to the Court and not repeated here.

### A. Personal and Work History

Plaintiff was born on February 3, 1961, and was 49 years old at the onset of his disability on August 19, 2010. (AR at 48-49, 115, 127, 130, 151, 170.) On June 1, 2005, plaintiff successfully completed three years of college. (*Id*. at 131.) Plaintiff's past relevant work history includes working as a firefighter. (*Id*. at 130.) Plaintiff started working for the Fire Department of the City of New York (the "FDNY") in August 1990. (*Id*. at 131.) On November 1, 1990, plaintiff successfully completed the FDNY Fire Training Academy. (*Id*.) As a firefighter, plaintiff would lift ladders, tools, victims,

and debris. (*Id*. at 132.) Plaintiff frequently lifted 50 pounds or more, and was able to lift up to 100 pounds. (*Id*. at 132.) On October 2, 2009, plaintiff made changes in his work activity, and ultimately stopped working on August 19, 2010 because of alleged disability due to a right knee medial meniscus tear, a left shoulder rotator cuff tear, neck and lower back degenerative disc disease, acid reflux, and emotional disorder. (*Id*. at 48-49, 115, 127, 130-31, 151.)

In a function report completed on June 5, 2013 (*id*. at 140-50), plaintiff reported that he lived in a house with his wife and two sons (*id*. at 115-16, 140, 153). On a typical day, plaintiff took anti-inflammatory and pain medication, helped his wife with caring for their children, which included taking his sons to and from the bus stop and driving them to and from sports activities, watched television, read books, browsed the internet, and bird-watched. (*Id*. at 141, 144.) Plaintiff had difficulty sleeping, preparing meals, taking care of personal hygiene and grooming, and performing house and yard work due to pain, weakness, and problems with stability, but he performed "simple chores" frequently. (*Id*. at 141-42.) Plaintiff possessed a driver's license and was able to operate a vehicle to go out on his own and provide transportation for his sons. (*Id*. at 141, 143-44.) Despite his ability to drive, plaintiff would shop only online for clothing, homeopathic remedies, and books. (*Id*.) Plaintiff stated that he had little interest in socializing with others, but he attended church and his sons' sports activities. (*Id*. at 145.) Plaintiff also stated that he stopped drinking because of his acid reflux. (*Id*.) Plaintiff had no difficulty using his hands, seeing, and talking, but had difficulty lifting, climbing stairs, kneeling, squatting, and reaching. (*Id*. at 145-46.) Plaintiff could not stand, walk, or sit for long periods of time. (*Id*. at 145-47.) He used a walker for assistance in the restroom

[1] Pages 1-340 of the AR appear at ECF No. 8; pages 341-366 appear at ECF No. 12.

and wore a brace on his right knee only when outside the house. (*Id*. at 146-47.) Plaintiff reported that he had difficulty paying attention and finishing what he started, but he could follow written and spoken instructions. (*Id*. at 147.)

To alleviate pain, plaintiff used homeopathic remedies, ice, and heat. (*Id*. at 149-50.) Additionally, plaintiff took a variety of prescription and non-prescription medications. (*Id*.)

## B. Relevant Medical History

### 1. Medical Evidence Before August 19, 2010

At some point in 2005, plaintiff underwent arthroscopic surgery on his right shoulder to repair his rotator cuff. (*Id*. at 217.) The procedure was performed at New York University Langone Medical Center. (*Id*.)

On December 13, 2007, plaintiff injured his lower back during a rescue while on duty as firefighter. (*Id*. at 257.) On December 15, 2007, plaintiff saw Dr. Gerard Casey. (*Id*.) Dr. Casey diagnosed plaintiff with a "back strain or sprain," and recommended heat, Advil, and Skelaxin. (*Id*.) In his examination report, Dr. Casey also indicated that plaintiff's current duty status was "FD," or full duty, effective August 13, 2007. (*Id*.)

On December 24, 2007, plaintiff saw Dr. J. Marchisella. (*Id*. at 256.) In his examination report, Dr. Marchisella commented that plaintiff had a back strain or sprain and nonradiating lower back pain. (*Id*.) Dr. Marchisella ultimately diagnosed plaintiff with a back strain or sprain, and recommended heat for plaintiff. (*Id*.) Dr. Marchisella also indicated that plaintiff's current duty status was "ML," or medical leave, effective December 15, 2007. (*Id*.)

On June 10, 2008, plaintiff saw Dr. Kattia Olender. (*Id*. at 255.) In her examination report, Dr. Olender commented that plaintiff had injured his lower back after lifting a 350-pound individual while on duty. (*Id*.) Dr. Olender diagnosed plaintiff with a "back strain or sprain," and recommended heat, stretching, Dolobid, and Skelaxin. (*Id*.) Dr. Olender also indicated that plaintiff's current duty status was "ML," effective June 8, 2008. (*Id*.)

On June 15, 2008, plaintiff saw Dr. Brian Maloney. (*Id*. at 254.) In his examination report, Dr. Maloney commented that plaintiff had a back strain or sprain, but no radicular pain. (*Id*.) Dr. Maloney ultimately diagnosed plaintiff with a "back strain or sprain," and recommended physical therapy. (*Id*.) Dr. Maloney also indicated that plaintiff's current duty status was "ML," effective June 8, 2008. (*Id*.)

On June 22, 2008, plaintiff saw Dr. Michael Lin. (*Id*. at 253.) In his examination report, Dr. Lin commented that plaintiff had a lumbar strain, no radiation, numbness, weakness, and was slowly beginning to improve. (*Id*.) Dr. Lin diagnosed plaintiff with a back strain or sprain, and recommended physical therapy, stretching, heat/ice, and nonsteroidal anti-inflammatory drugs. (*Id*.) Dr. Lin also indicated that plaintiff's current duty status was "ML," effective June 8, 2008. (*Id*.)

On June 29, 2008, plaintiff returned to Dr. Lin. (*Id*. at 252.) In his examination report, Dr. Lin commented that plaintiff had significant improvement with physical therapy and good range of motion and strength. (*Id*.) Dr. Lin diagnosed plaintiff with a back strain or sprain, and recommended home physical therapy and core strengthening. (*Id*.) Dr. Lin also indicated that plaintiff's current duty status was "ML," effective June 8, 2008. (*Id*.)

On October 2, 2009, during a tactical training at the New York Police Department (the "NYPD") Academy, plaintiff injured his right knee. (*Id.* at 167, 168, 213, 242, 251.) Specifically, his right knee was jammed during a combative physical session with three NYPD trainers from the Weapons and Tactics Unit. (*Id.* at 168, 242.) Plaintiff reported that this condition caused a change in his work activity. (*Id.* at 130.)

An October 12, 2009 MRI of plaintiff's left knee showed: a rupture of the ACL, a bucket handle tear of the medial meniscus, a small fracture involving the posterior non-weight bearing cortex of the lateral tibial plateau, a shallow impaction injury of the lateral condylar patellar sulcus, and a deep focal chondral loss of the central femoral trochlea. (*Id.* at 173, 284-85.)

On November 14, 2009, plaintiff saw Dr. Pierc Ferriter. (*Id.* at 251.) In his examination report, Dr. Ferriter commented that plaintiff's right knee was bent and sprained and was painful and swollen. (*Id.*) Dr. Ferriter diagnosed a meniscus-medial tear, and indicated that plaintiff's current duty status was "ML," effective November 14, 2009. (*Id.*)

A November 16, 2009 MRI of plaintiff's right knee showed a complex/macerated tear of the posterior horn and body of the medial meniscus with suspected associated meniscal fragment/flap at the root attachment, intrasubstance tearing noted of the anterior horn and root attachment, mild focal edema within the lateral femoral condyle and posterolateral tibial plateau likely reflecting contusions, suspected associated mid-grade ACL sprain, and patellofemoral compartment chondromaiacia. (*Id.* at 168, 173, 242, 262-63, 293.)

On November 18, 2009, plaintiff saw Dr. Stuart B. Cherney for pain and loss of motion in his right knee resulting from his October 2, 2009 injury. (*Id.* at 213, 293.) [2] After physical examination, Dr. Cherney noted that plaintiff had a range of motion of 5-90 degrees, tenderness over the medial joint line, Lachman 4mm with no drop back, 4mm of medial and 4mm of lateral opening on stress, and slight decreased patella excursion with no pain on patella compression, but his distal neurovascular was intact. (*Id.* at 213.) Dr. Cherney also reviewed an MRI of plaintiff's right knee and determined that plaintiff had a right knee tear medial meniscus with probable minimal partial tear ACL and patellofemoral chondrosis/arthrosis. (*Id.*) Because plaintiff's knee was locked and he was walking with a limp wearing a hinged knee brace, Dr. Cherney recommended right knee arthroscopy. (*Id.*)

On November 20, 2009, plaintiff returned to Dr. Ferriter. (*Id.* at 250.) Dr. Ferriter diagnosed plaintiff with a meniscus-medial tear and authorized surgery. (*Id.*) Dr. Ferriter also indicated that plaintiff's current duty status was "ML," effective November 14, 2009. (*Id.*)

On November 24, 2009, plaintiff underwent arthroscopic surgery on his right knee. (*Id.* at 168, 174, 209, 217, 242, 249, 293-94, 297-99.) The procedure was performed by Dr. Cherney at the North Shore Surgery Center in Smithtown, New York. (*Id.* at 168, 217, 242, 293, 298-99.) At the end of Dr. Cherney's operation report, he indicated that "there [was] some risk for persistent anterior and medial symptoms" going forward. (*Id.* at 299.)

The following day, plaintiff returned to Dr. Cherney. (*Id.* at 212, 294.) Dr. Cherney stated that plaintiff's pain was moderate, and

---

[2] In the Disability Determination Explanation report, Dr. Cherney was listed as a "Treating Source." (*Id.* at 50.)

that he was totally disabled as a firefighter. (*Id*. at 212.) Plaintiff had a range of motion of 20-90 degrees, mild swelling, no calf swelling or tenderness, and he was neurovascularly intact. (*Id*.)

On December 2, 2009, one week after plaintiff's arthroscopic surgery, plaintiff returned to Dr. Cherney. (*Id*. at 211, 294.) Dr. Cherney stated that plaintiff's symptoms were improving, but he was still totally disabled from work. (*Id*. at 211.) Plaintiff was still only partial weight bearing, but plaintiff's range of motion was improving, and it was 7-105 degrees. (*Id*.) Plaintiff had no swelling, minimal joint line tenderness, no calf swelling or tenderness, and his distal neurovascular was intact. (*Id*.)

On December 18, 2009, plaintiff returned to Dr. Ferriter. (*Id*. at 249.) Dr. Ferriter diagnosed plaintiff with a meniscus-medial tear, and indicated that plaintiff's current duty status was "ML," effective November 14, 2009. (*Id*.)

On January 18, 2010, plaintiff saw Dr. Konstantin Tarashansky for gastroesophageal reflux disease ("GERD"). (*Id*. at 230.) Dr. Tarashansky performed a laryngoscopy on plaintiff, and found that his postcricoid and arytenoids were abnormal. (*Id*.)

On January 22, 2010, plaintiff saw Dr. Peter Weil for GERD. (*Id*. at 237-38.) In his report, under the findings and impression sections, Dr. Weil indicated VAC syndrome and GERD (*id*. at 237); the rest of the report was illegible.

On February 16, 2010, plaintiff returned to Dr. Tarashansky. (*Id*. at 231-32.) Dr. Tarashansky conducted both physical and endoscopic examinations. (*Id*. at 231.) However, the impressions and recommendations sections from the report related to those exams were illegible. (*Id*. at 232.)

On March 24, 2010, plaintiff returned to Dr. Weil. (*Id*. at 235-36.) Again, under the findings and impression sections of his report, Dr. Weil indicated VAC syndrome and GERD (*id*. at 235), and the rest of the report was illegible.

On June 2, 2010, while on duty as a firefighter, plaintiff injured his lower back again after digging through debris and moving waterlogged furniture during a fire investigation. (*Id*. at 169, 242, 314, 326.)

On June 10, 2010, plaintiff returned to Dr. Marchisella. (*Id*. at 248.) Dr. Marchisella diagnosed plaintiff with a back strain or sprain, and recommended physical therapy, Advil, and Cyclobenzaprine. (*Id*.) Dr. Marchisella also indicated that plaintiff's current duty status was "ML," effective June 6, 2010. (*Id*.)

On June 19, 2010, plaintiff saw Dr. M. Weiden. (*Id*. at 247.) In his examination report, Dr. Weiden commented that plaintiff had a history of lower back pain and could not bend as a result of a new injury. (*Id*.) Further, plaintiff was being treated for GERD. (*Id*.) Dr. Weiden's diagnosis was as follows: back strain or sprain, surgery arthroscopic, and gastroesophagitis. (*Id*.) Dr. Weiden also indicated that plaintiff's current duty status was "ML," effective June 6, 2010. (*Id*.)

A June 22, 2010 MRI of plaintiff's lumbar spine showed: multiple small Schmorl's nodes from the level of L1 through L4; either minimal disc bulge or a small central disc herniation at T11-T12; minimal disc bulge at L3-4; central and slightly right paracentral disc herniation at L4-5; and minimal posterior subluxation with small central disc herniation at L5-S1. (*Id*. at 169, 172, 242, 260-61.)

On June 27, 2010, plaintiff returned to Dr. Ferriter. (*Id*. at 246.) In his examination report, Dr. Ferriter commented that plaintiff

had a back strain or sprain, was still having pain and trouble sitting, and plaintiff's pain was present with flexion and extension. (*Id*.) Dr. Ferriter's diagnosis was as follows: back strain or sprain, surgery arthroscopic, and gastroesophagitis. (*Id*.) Dr. Ferriter also indicated that plaintiff's current duty status was "ML," effective June 6, 2010. (*Id*.)

On July 3, 2010, plaintiff returned to Dr. Ferriter. (*Id*. at 245.) In his examination report, Dr. Ferriter commented: still lower back pain, no leg pain, no numbness, and limited motion of spine present with spasm. (*Id*.) Dr. Ferriter's diagnosis was as follows: back strain or sprain, surgery arthroscopic, and gastroesophagitis. (*Id*.) Dr. Ferriter also indicated that plaintiff's current duty status was "ML," effective June 6, 2010. (*Id*.)

A July 6, 2010 MRI of plaintiff's right knee showed a longitudinal oblique tear of the posterior horn of the medial meniscus, irregularity of the body of the medial meniscus, joint effusion with associated diffuse synovitis, and cartilage loss in the patellofemoral compartment. (*Id*. at 168, 174, 242, 258-59, 297.)

On July 12, 2010, plaintiff returned to Dr. Cherney. (*Id*. at 209-10, 294-95, 297.) Dr. Cherney indicated that, after right knee arthroscopic surgery and several months of physical therapy, plaintiff returned to work as a fire marshal at the end of January 2010. (*Id*. at 209.) Nevertheless, plaintiff's symptoms continued to worsen with increased activity, and plaintiff had pain going down stairs, had pain walking downhill, had difficulty kneeling and squatting, and had increased crepitus. (*Id*.) Plaintiff did some home exercises including using a bike, but was unable to return to running. (*Id*.) After examination, Dr. Cherney noted that plaintiff's quad strength was in the good to excellent range; Lachman

was 4mm at the firm endpoint; McMurray was negative; and plaintiff had the following symptoms: no swelling or effusion, moderate patellofemoral crepitus through active flexion extension, no LPCS present, some pain present on patella compression, no definite joint line tenderness, no tibial drop back, and no calf swelling or tenderness. (*Id*.) Dr. Cherney reviewed an MRI of plaintiff's right knee and found some degenerative changes in the femoral sulcus with slight chondritic changes over the median ridge of the patella, and found that trace effusion was present. (*Id*.) Dr. Cherney did not recommend surgery, but rather a home exercise program and anti-inflammatory medication. (*Id*. at 210.)

In a letter dated July 15, 2010, Dr. Cherney stated, "The prognosis for return to full duty as a fire marshal is poor. The changes and disability status regarding [plaintiff's] right knee are permanent in nature." (*Id*. at 297.)

On July 16, 2010, plaintiff saw Dr. Thomas J. Dowling for pain in his lower back and neck. (*Id*. at 171, 314-19, 326-28.) Plaintiff reported his pain level as an 8/10 on the visual analog scale. (*Id*. at 314, 326.) Following a lumbosacral spinal examination, Dr. Dowling commented that plaintiff had no deformity, no tenderness or spasm, and no evidence of peripheral vascular disease, and that his range of motion was within normal limits, albeit he did have pain with range of motion. (*Id*. at 315.) Following a lower extremity examination, Dr. Dowling commented that plaintiff had no tension signs and his gait was normal. (*Id*.) Dr. Dowling diagnosed plaintiff with mechanical discogenic low back pain and an underlying herniated disc at L4-5 and L5-S1, further commenting that physical impairment was "temporary total." (*Id*. at 315-16.) Dr. Dowling then recommended physical therapy two-to-three

times per week for the lumbar spine for six weeks, epidural steroid injections, and a Medrol-Dosepak. (*Id*. at 316, 327-29.)

On July 19, 2010, plaintiff saw Dr. Dutkowsky. (*Id*. at 244.) In his examination report, Dr. Dutkowsky commented: right knee strain, crepitus rom intact, no effusion or instability, and mild medial collateral lig laxity. (*Id*.) Dr. Dutkowsky's diagnosis was as follows: back strain or sprain, surgery arthroscopic, and gastroesophagitis. (*Id*.) Dr. Dutkowsky also indicated that plaintiff's current duty status was "ML," effective July 15, 2010. (*Id*.)

On August 2, 2010, plaintiff saw Dr. Danna Mannor. (*Id*. at 243.) Dr. Mannor's diagnosis was as follows: back strain or sprain, surgery arthroscopic, and gastroesophagitis. (*Id*.) Dr. Mannor recommended that plaintiff see the FDNY Pension Fund's Medical Board ("the Medical Board"), and indicated that plaintiff's current duty status was "LD," or light duty, effective July 6, 2010. (*Id*.)

Additionally, at some point during August 2010, plaintiff saw Dr. Mark Spadaro from the FDNY Bureau of Health Services World Trade Center ("WTC") Program. (*Id*. at 157.) Dr. Spadaro prescribed Aciphex (Rabeprazole) and Pantoprazole (Protonix). (*Id*. at 157, 160, 163.)

### 2. Medical Evidence from August 19, 2010 to June 3, 2014

On August 19, 2010, plaintiff stopped working as a firefighter and his disability allegedly began. (*Id*. at 48-49, 115, 127, 130-31, 151.) In a letter to Fire Commissioner Salvatore Cassano, dated August 23, 2010, Chief Medical Officer Kerry J. Kelly, M.D. stated that an FDNY Medical Board Committee ("the Committee") diagnosed plaintiff with medial meniscus tear of the right knee, status post arthroscopic surgery of the right knee, post-traumatic patellofemoral arthrosis of the right knee, and a herniated disc of the lumbar spine L4-5 and disc bulge T11-12. (*Id*. at 168-69.) The Committee recommended that plaintiff had a partial permanent disability, and that he was unfit for fire duty. (*Id*. at 169.) The Committee also recommended that plaintiff be put on light duty with limited service. (*Id*.) The examination report indicated that plaintiff continued to have pain and stiffness, had difficulty with stairs, had palpable crepitus, and was unable to kneel or squat. (*Id*. at 242.)

On August 24, 2010, plaintiff saw Dr. Alan M. Schuller for GERD. (*Id*. at 155.) Dr. Schuller performed an upper endoscopy on plaintiff, and the results were unremarkable. (*Id*. at 279.) Dr. Schuller also performed a colonoscopy on plaintiff, which showed a serrated adenoma. (*Id*.)

On September 27, 2010, plaintiff returned to Dr. Cherney. (*Id*. at 293-96.) In his report, Dr. Cherney indicated that plaintiff had a range of motion of 5-90 degrees, tenderness over the medial joint line, and slight decreased patella excursion with no pain on patella compression. (*Id*. at 293.) Additionally, plaintiff's Lachman was 4mm with no drop back, his distal neurovascular was intact, and there were 4mm of medial and lateral opening on stress. (*Id*.) Plaintiff had pain with stairs and walking downhill, was unable to run, and had difficulty kneeling and squatting. (*Id*. at 295-96.) Dr. Cherney diagnosed plaintiff with right knee displaced bucket handle tear medial meniscus, right knee chondrosis of patella and femoral sulcus, right knee chondrosis medial femoral condyle, and right knee 3 compartment synovitis. (*Id*. at 295.) Because plaintiff's knee was locked and he was consequently walking with a limp wearing a hinged knee brace, Dr.

Cherry recommended right knee arthroscopy. (*Id*. at 293.)

On January 6, 2011, Dr. Basil Dalavagas, an impartial orthopedic specialist consultant for the Medical Board provided the Medical Board with an opinion that plaintiff was permanently disabled for full fire duty due to his right knee. (*Id*. at 167.) On March 3, 2011, the Medical Board unanimously recommended that plaintiff be granted an accident disability retirement based on his October 2, 2009 injury. (*Id*.) The Medical Board also recommended that plaintiff's application for disability retirement under the provisions of the WTC Program be denied. (*Id*.) Subsequently, based on this recommendation, in a letter dated March 3, 2011, the Board of Trustees of the FDNY Pension Fund awarded plaintiff an accident disability retirement and denied plaintiff's application for disability retirement under the World Trade Center Bill. (*Id*. at 165.)

A February 23, 2012 MRI of plaintiff's cervical spine showed: mild degenerative changes, including degenerative spurring and slight interspace narrowing, disc bulging, and bilateral mild foraminal narrowing, at C4-5; broad-based central right-sided spur/disc complex, moderate to severe focal right foraminal narrowing, mild to moderate left foraminal narrowing, and slight impingement on the right side of the spinal cord at C5-6; degenerative spurring and interspace narrowing, shallow central right-sided spur/disc complex, moderate to severe focal proximal right foraminal narrowing, and moderate left foraminal narrowing at C6-7. (*Id*. at 173, 269-70, 316.)

On March 12, 2012, plaintiff returned to Dr. Dowling. (*Id*. at 316, 323-25.) Plaintiff complained of neck pain radiating from the left shoulder and left arm with associated numbness and tingling to the left arm, and reported a pain level of 5/10 on the visual analog scale. (*Id*. at 316, 323.) Dr. Dowling reported that a cervical spine exam revealed no muscle spasm or tenderness, and that plaintiff was neurologically intact. (*Id*. at 316, 324.) Dr. Dowling added that plaintiff had pain with extensions, which radiated into the left upper extremity, a cervical range of motion within normal limits, a positive Spurling's sign on the left and negative on the right, symmetric reflexes, normal sensation, normal strength, and a normal gait. (*Id*.) Dr. Dowling diagnosed plaintiff with cervical radiculopathy due to underlying degenerative disc disease leading to foraminal stenosis of the cervical spine. (*Id*. at 316.) Dr. Dowling concluded that plaintiff's physical impairment was total, and recommended cervical translaminal epidural steroid injections, Omeprazole, and a Medrol-Dosepak. (*Id*. at 316, 324.)

On April 5, 2012, while plaintiff was preoccupied watching his son's hockey game, an individual collided with him. (*Id*. at 205.) Plaintiff fell onto the ice, injuring his left shoulder. (*Id*.)

On April 13, 2012, plaintiff saw Dr. Jordan Kerker for pain in his left shoulder. (*Id*. at 156, 205-06.) In his report, Dr. Kerker indicated that plaintiff had been having pain anteriorly, which was not remitting and was mostly over the anterior rotator cuff and over the subscapularis. (*Id*. at 205.) After physical examination, Dr. Kerker noted that plaintiff had no atrophy, swelling, or deformity to the left shoulder, no tenderness to touch over his ac joint, no clear ac separation or dislocation, full abduction and internal and external rotation, and no deficits or weakness in his supraspinatus or infraspinatus. (*Id*. at 206.) Plaintiff's forward flexion was limited to about 70 degrees, but, passively, he had a full range of motion. (*Id*.) Dr. Kerker indicated that plaintiff was neurovascularly

intact, and had a negative speed test and a positive O'Brien test. (*Id*.) Dr. Kerker also reviewed two x-rays of plaintiff's left shoulder, commenting that they demonstrated a 2B acromial arch and concentric glenohumeral joint, but no advanced degenerative changes. (*Id*.) Dr. Kerker recommended that plaintiff get an MRI of his left shoulder and take anti-inflammatories. (*Id*.)

An April 19, 2012 MRI of plaintiff's left shoulder showed a full-thickness tear of the supraspinatus tendon with 1.7 cm of retraction, and a high grade partial tearing of the subscapularis tendon without evidence of complete rupture. (*Id*. at 173, 186-87.) On April 23, 2012, plaintiff had a phone conversation with Dr. Kerker to discuss the MRI results. (*Id*. at 204.) Dr. Kerker told plaintiff the MRI was positive for a full-thickness tear of the supraspinatus tendon and a high-grade partial tear of the subscapularis. (*Id*.) Dr. Kerker and plaintiff discussed the risks and benefits of surgical intervention. (*Id*.) On May 4, 2012, plaintiff returned to Dr. Kerker. (*Id*. at 202-03.) In his report, Dr. Kerker noted that plaintiff had a subscapularis partial tear and a full-thickness tear of the supraspinatus. (*Id*. at 202.) Plaintiff had pain and tenderness with internal and external rotation of the shoulder, severe weakness with supraspinatus testing, and an equivocal speed test and positive O'Brien test, but was nonetheless neurovascularly intact. (*Id*. at 203.) Dr. Kerker and plaintiff again discussed the risks and benefits of surgical arthroscopy. (*Id*. at 202.) Dr. Kerker also told plaintiff that he would need to be in a sling for four weeks, and full recovery would take six months. (*Id*.) Plaintiff scheduled surgery for the following week. (*Id*. at 203.)

On May 8, 2012, plaintiff underwent arthroscopic surgery on his left shoulder to repair his rotator cuff. (*Id*. at 173-74, 216, 267-68.) The procedure was performed by Dr. Kerker at the Melville Surgery Center in Melville, New York. (*Id*. at 267-68.)

Approximately one week after the surgery, on May 16, 2012, plaintiff returned to Dr. Kerker. (*Id*. at 200-01.) In his report, Dr. Kerker noted that plaintiff was "doing okay." (*Id*. at 200.) He also indicated that plaintiff had a large avulsion of all three tendons, significant pain, no residual swelling or effusion, limited motion in the shoulder, and good function of the elbow, hand, and wrist. (*Id*. at 200-01.) Plaintiff was neurovascularly intact and his compartments were soft. (*Id*. at 201.) Dr. Kerker also reviewed two X-rays of plaintiff's left shoulder, commenting that they demonstrated well-performed acromioplasty, concentric glenohumeral joint, and no advanced degenerative changes. (*Id*.) Dr. Kerker recommended that plaintiff continue wearing the sling for three more weeks. (*Id*.)

Approximately one month after the surgery, on June 6, 2012, plaintiff returned to Dr. Kerker. (*Id*. at 198-99.) In his report, Dr. Kerker noted that plaintiff was out of the sling, ready to start physical therapy, and "doing quite well." (*Id*. at 198.) Dr. Kerker also indicated that plaintiff had very little motion, secondary to pain and apprehension, no gross motor or sensory deficits, symmetric reflexes, good function of the elbow, hand and wrist, and his compartments were soft. (*Id*. at 199.)

On June 20, 2012, plaintiff was admitted to the emergency room of the St. Catherine of Sienna Hospital due to gastro pain. (*Id*. at 158, 217.) Plaintiff was prescribed medication and then released. (*Id*. at 158.)

Approximately three months after his surgery, on July 26, 2012, plaintiff returned

to Dr. Kerker. (*Id*. at 196-97.) In his report, Dr. Kerker noted that plaintiff was "doing quite well" and "progressing nicely in therapy." (*Id*. at 196-97.) Dr. Kerker indicated that plaintiff had 110 degrees of forward flexion and abduction, internal rotation to the posterior hip, and a passive range of motion of 130 to 140 degrees of forward active flexion and abduction. (*Id*. at 197.) Dr. Kerker added that plaintiff had improving strength in his rotator cuff and was neurovascularly intact. (*Id*.)

On December 4, 2012, plaintiff returned to Dr. Dowling. (*Id*. at 317, 320-22.) Plaintiff complained of neck pain, left shoulder pain, left arm pain, left hand numbness and tingling, and constant lower back pain that was mechanical in nature. (*Id*. at 317.) Plaintiff also reported his pain level as a 6/10 on the visual analog scale. (*Id*. at 317, 320.) After a cervical spine examination, Dr. Dowling indicated that plaintiff had some spasm on the left side, tenderness on the left side of the trapezius and paraspinals, a painful range of motion that was within normal limits, and a positive Spurling's sign on the left and negative on the right. (*Id*. at 317, 321.) After a lower back examination, Dr. Dowling indicated that plaintiff had no spasm and no tenderness, pain with flexion, a normal range of motion, and a normal gait. (*Id*. at 317, 321.) Dr. Dowling commented that plaintiff was neurologically intact, but his physical impairment was total. (*Id*. at 317, 322.) Dr. Dowling diagnosed plaintiff with discogenic low back pain with an underlying herniated disc, cervical radiculopathy, and underlying degenerative disc disease and foraminal stenosis. (*Id*. at 318.) Dr. Dowling then recommended that plaintiff take a Medrol Dosepak followed by Mobic (Meloxicam). (*Id*. at 317, 322.)

On December 6, 2012, plaintiff saw Dr. Jennifer N. Duffy, Ph.D. for a psychological consultation. (*Id*. at 171, 188-192.) Dr. Duffy indicated that, during the session, plaintiff's level of consciousness was not impaired and his attention and concentration were not impaired. (*Id*. at 190-91.) She also indicated that plaintiff's mood was predominately one of moderate manifest depression, anxiety, and agitation. (*Id*. at 191.) In her report, Dr. Duffy wrote that plaintiff experienced moderate to severe symptoms as a consequence of his work-related incident, including manifest depression, anxious irritable mood, increased stress and tension, insomnia, fatigue, as well as diminished self-esteem and emotional coping capability. (*Id*.) She added that plaintiff's injuries and subsequent disability from his accident in August 2010 were significantly interfering in his social/emotional/occupational functioning. (*Id*.) Dr. Duffy recommended that plaintiff would benefit from psychotherapeutic intervention, should attend individual therapy, should be referred to a psychiatrist to determine if he was a candidate for psychotropic medication, and would benefit from stress management training and cognitive therapy focusing on interpersonal communication and problem-solving skills. (*Id*.)

Approximately eight months after his arthroscopic surgery, on December 12, 2012, plaintiff returned to Dr. Kerker. (*Id*. at 194-95.) In his report, Dr. Kerker stated that plaintiff was "doing extremely well." (*Id*. at 194-95.) Dr. Kerker indicated that plaintiff had excellent motion and good strength, full forward flexion and abduction, slightly restricted internal rotation, excellent external rotation, and good strength in the rotator cuff. (*Id*. at 194-95.) Dr. Kerker added that plaintiff was neurovascularly intact overall and had no real restrictions, other than lifting heavy weights. (*Id*. at 195.) Dr. Kerker concluded by stating that

plaintiff could return to normal activities. (*Id.*)

On December 17, 2012, plaintiff returned to Dr. Cherney. (*Id.* at 208.) In his report, Dr. Cherney noted that plaintiff had Grade III changes in the patellofemoral joint and medial compartment and symptoms of varying degrees of severity from no pain to moderate pain. (*Id.*) Further, plaintiff's range of motion was full, quad strength was excellent, and stability was normal. (*Id.*) Dr. Cherney also noted that there was no patellofemoral crepitus, no pain on compression, no joint line tenderness, and that there was trace increased varus equal to the opposite knee. (*Id.*) Dr. Cherney indicated that plaintiff had limited his activities to minimal impact or no impact sports, and that plaintiff swam, biked, and did yoga. (*Id.*) Nevertheless, Dr. Cherney suggested that plaintiff use a hinged knee brace for certain activities. (*Id.*)

On February 24, 2013, plaintiff was admitted to the emergency room of the St. Catherine of Sienna Hospital due to gastro pain. (*Id.* at 158, 217.) Plaintiff was prescribed medication and then released. (*Id.* at 158.)

Approximately one year after plaintiff's arthroscopic surgery, on April 5, 2013, plaintiff returned to Dr. Kerker. (*Id.* at 156, 264-66.) In his report, Dr. Kerker noted that plaintiff was still developing some stiffness and decreased range of motion, and was still having some mild pain, but had no numbness or tingling, and "worked out a lot." (*Id.* at 194-95, 264.) After physical examination, Dr. Kerker noted that plaintiff had no residual swelling or effusion, full forward flexion and abduction, excellent strength in the rotator cuff and subscapularis, no deficits or weakness overall, a negative drop-arm sign, and no pain with resisted flexion. (*Id.* at 265.) Further, plaintiff was neurovascularly intact,

but had pain with resisted extension. (*Id.*) Plaintiff complained of pain in his right elbow, and Dr. Kerker diagnosed it as tennis elbow and gave plaintiff a shot of Celestone and Marcaine. (*Id.*) Dr. Kerker then recommended that plaintiff continue exercising his left shoulder and follow up with Dr. Kerker as needed. (*Id.*)

On April 11, 2013, plaintiff saw Dr. Samir Dutta. (*Id.* at 216-19.) The Division of Disability Determination had referred plaintiff to Dr. Dutta for an orthopedic examination. (*Id.* at 216.) In his report, Dr. Dutta noted that plaintiff had experienced pain in his neck for ten years, and that the pain had worsened during the prior two years. (*Id.*) Dr. Dutta also noted that plaintiff had experienced lower back pain for twenty-five years, a problem with his left shoulder for one year, and had injured his right shoulder fifteen years prior. (*Id.*) Regarding plaintiff's general appearance, gait, behavior, and station, Dr. Dutta commented that plaintiff appeared to be in no acute distress, had a slight limp on the right side, could walk on his heels and toes without difficulty, and could squat halfway. Dr. Dutta further commented that plaintiff's station was normal, plaintiff used no assistive device, needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (*Id.* at 217-18.) Regarding plaintiff's cervical spine, Dr. Dutta commented: flexion 30 degrees, extension 30 degrees, lateral flexion and rotation 50 degrees bilaterally, no cervical or paracervical pain or spasm, and no trigger points. (*Id.* at 218.) Regarding plaintiff's upper extremities, Dr. Dutta commented: shoulder forward elevation bilaterally degrees, abduction 110 degrees, full adduction, internal rotation, external rotation bilaterally, no joint inflammation, effusion, or instability, strength 5/5 in proximal and distal muscles, no muscle atrophy, and no

sensory abnormality. (*Id*.) Regarding plaintiff's thoracic and lumbar spines, Dr. Dutta commented: flexion 70 degrees, lateral bending 20 degrees, bilateral extension 20 degrees, rotation 20 degrees bilaterally, no SI joint or sciatic notch tenderness, no spinal or parspinal tenderness, no scoliosis or kyphosis, slight spasm noted, SLR test negative bilaterally, and no trigger points. (*Id*.) Regarding plaintiff's lower extremities, Dr. Dutta commented: knee flexion right 110 degrees, left knee 120 degrees flexion, strength 5/5 in proximal and distal muscles bilaterally, no muscle atrophy, no sensory abnormality, and no joint effusion, inflammation, or instability. (*Id*.) Dr. Dutta then provided the following diagnosis: post repair supraspinatus tendon, left shoulder, post repair right shoulder subscapularis, post meniscectomy, medial, right knee, history of GERD, posttraumatic stress disorder, history of depression, acid reflux, degenerative disc disease from C2 through C7, and herniated disc of L4-L5. (*Id*. at 218-19.) Dr. Dutta concluded by commenting that plaintiff's prognosis was stable, that plaintiff had mild limitations for sitting and standing, and that plaintiff had moderate limitation for prolonged walking and lifting heavy weight on a continuous basis. (*Id*. at 219.)

On June 7, 2013, plaintiff saw psychologist Kathleen Acer, Ph.D. for an evaluation. (*Id*. at 223-26.) In her report, Dr. Acer left the longitudinal history section blank, but commented as follows in the psychiatric history section: plaintiff reported some issues related to his experiences in 9/11, he has never been in regular treatment, he had no current counseling or treatment, and he stated he was starting a couples therapy program. (*Id*. at 223.) Regarding plaintiff's current functioning, Dr. Acer commented: he has some difficulty falling and staying asleep at times, some decrease in motivation, tendency to prefer avoiding social interactions, no recurrent thoughts of death or suicide, no severe symptoms of a major depressive disorder, some anxiety, some nightmares and flashbacks of his experiences of 9/11, but is not experiencing any significant ongoing trauma related symptoms, and no symptoms of panic, mania, or formal thought disorder. (*Id*. at 224.) Dr. Acer later added that there did not appear to be significant limitations in plaintiff's ability to follow and understand directions and instructions, appropriately perform tasks, or maintain attention and concentration, but that plaintiff had some minor difficulties dealing with stress. (*Id*. at 225.) Dr. Acer diagnosed plaintiff with adjustment disorder, undifferentiated, mild, and concluded her report by stating that, overall, the results of the evaluation did not appear to be consistent with severe psychiatric issues that would hamper functioning. (*Id*.) She did, however, note that plaintiff might benefit from some individual counseling. (*Id*. at 226.)

On June 21, 2013, M. Graff, Ph.D. reviewed the evidence and provided a state agency Medically Determinable Impairments and Severity ("MDI") assessment. (*Id*. at 53-54.) Dr. Graff stated that plaintiff's restriction of activities of daily living were mild, plaintiff's difficulties in maintaining social functioning were mild, plaintiff had no difficulties maintaining concentration, persistence, or pace, and plaintiff had no repeated episodes of decompensation of extended duration. (*Id*. at 53.) Dr. Graff concluded stating that plaintiff's impairment or combination of impairments were non-severe. (*Id*. at 54.)

Also on June 21, 2013, single decisionmaker A. Knight ("SDM Knight") reviewed the evidence and provided a state agency RFC assessment. (*Id*. at 55-57.) After finding that plaintiff had exertional and postural limitations, SDM Knight rated

each limitation. (*Id*. at 55-56.) SDM Knight stated that plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds, frequently lift and/or carry (including upward pulling) 10 pounds, stand and/or walk (with normal breaks) for a total of approximately six hours in an eight-hour workday, and push and/or pull without limitation (including operation of hand and/or foot controls), other than shown for lift and/or carry. (*Id*. at 55.) SDM Knight also stated that plaintiff could frequently climb ramps/stairs, occasionally climb ladders/ropes/scaffolds, frequently balance, occasionally stoop, occasionally kneel, occasionally crouch, and frequently crawl. (*Id*. at 55-56.) SDM Knight also found that plaintiff had no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (*Id*. at 56.) SDM Knight determined that plaintiff did not have the RFC to perform his skilled past relevant work as a firefighter. (*Id*. at 56-57.) However, SDM Knight found that plaintiff was not limited to unskilled work because of his impairments, and that plaintiff demonstrated the maximum sustained work capability for light work based on the seven strength factors of his physical RFC. (*Id*. at 57.) In sum, based on the documented findings, SDM Knight determined that plaintiff was not disabled. (*Id*.)

On August 26, 2013, plaintiff returned to Dr. Schuller and complained of heartburn. (*Id*. at 280.) Dr. Schuller performed a colonoscopy and endoscopy on plaintiff. (*Id*. at 155, 278-81.) Dr. Schuller also diagnosed plaintiff with colonic polyps and GERD, and recommended that he continue taking Aciphex (Rabeprazole) and return for another colonoscopy and endoscopy. (*Id*. at 281.)

On September 23, 2013, plaintiff returned to Dr. Schuller, who performed an upper endoscopy and a colonoscopy on plaintiff. (*Id*. at 271-77, 282-83.) Both impressions were normal. (*Id*. at 271-72, 282.) Dr. Schuller recommended that plaintiff continue taking Aciphex (Rabeprazole) and return for another colonoscopy in five years. (*Id*. at 282.)

On February 10, 2014, plaintiff returned to Dr. Cherney. (*Id*. at 292.) In his report, Dr. Cherney indicated that plaintiff continued to have pain and stiffness, mostly over the medial aspect of the right knee of varying degrees of severity, and increasing medial pain in the left knee. (*Id*.) With respect to plaintiff's right knee, Dr. Cherney commented that range of motion showed a lack of 5 degrees flexion, there was some increasing varus, there was no patellofemoral crepitus, there was tenderness present over the medial joint line, plaintiff's strength was excellent, and plaintiff's stability was normal. (*Id*.) Dr. Cherney indicated that plaintiff's pain in his right knee increased with any increased level of activity, but plaintiff was still able to do low impact fitness-type exercise. (*Id*.) With respect to plaintiff's left knee, Dr. Cherney commented that there was essentially full range of motion, some tenderness over the medial joint line, slight increased varus alignment, no patellofemoral crepitus, no pain on compression, and plaintiff's stability was normal. (*Id*.) Dr. Cherney recommended that plaintiff refrain from all jumping or impact sports or activity and any heavy lifting. (*Id*.) Dr. Cherney concluded that with respect to plaintiff's right knee, he had a permanent disability. (*Id*.)

On February 20, 2014, plaintiff returned to Dr. Dowling. (*Id*. at 317.) Plaintiff complained of neck and back pain with numbness into his left hand around the digits. (*Id*.) With respect to plaintiff's neck, Dr. Dowling commented that plaintiff had pain on Valsalva maneuver, and his pain

was intermittent but worse at night depending on his neck position. (*Id*.) Dr. Dowling indicated that plaintiff did not have any radiating pain, and plaintiff rated his pain as a 4/10 on the visual analog scale. (*Id*.) After a cervical spine examination, Dr. Dowling noted that plaintiff had no spasm, some tenderness and pain with range of motion, a full range of motion, a positive Spurling's sign on the left, which reproduced neck pain only, a negative Lhermitte's sign, a negative right sided Spurling's sign, and a full range of motion of both shoulders. (*Id*. at 318.) Radiographs of plaintiff's cervical spine showed degenerative changes at C4-5, C5-6, and C6-7 and straightening consistent with spasm. (*Id*.) After a lumbosacral spinal examination, Dr. Dowling indicated that plaintiff had no deformity, no tenderness or spasm, pain with range of motion during extension and flexion, a range of motion diminished by 10 degrees, a normal spinal rhythm, and a normal gait. (*Id*.) Plaintiff was neurologically intact in both the upper and lower extremities. (*Id*.) Dr. Dowling diagnosed plaintiff with cervical foraminal stenosis, underlying disc disease, cervical radiculopathy, and discogenic low back pain, with underlying herniated disc. (*Id*.) Dr. Dowling recommended that plaintiff take Mobic (Meloxicam), get an MRI, and return for an evaluation for epidural steroid injections. (*Id*. at 319.)

On March 3, 2014, Dr. Dowling completed an SSA Medical Source Statement of Ability to Do Work-Related Activities for plaintiff. (*Id*. at 308-13.) Dr. Dowling indicated that plaintiff could lift up to 20 pounds occasionally and 21-50 pounds rarely, but could never lift 51-100 pounds. (*Id*. at 308.) Plaintiff could also carry up to 20 pounds occasionally and 21-50 pounds rarely, but could never carry 51-100 pounds. (*Id*.) Plaintiff could sit, stand, and walk for only 30 minutes at a time without

interruption. (*Id*. at 309.) Plaintiff could sit, stand, and walk for only two hours in an eight-hour workday. (*Id*.) Plaintiff did not require the use of a cane to walk. (*Id*.) Plaintiff could climb stairs and ramps, stoop, kneel, and crouch occasionally, but could never climb ladders or scaffolds, balance, or crawl. (*Id*. at 311.) Further, Dr. Dowling indicated that plaintiff could perform activities like shopping, travelling without a companion for assistance, walking without using a wheelchair, walker, cane, or crutches, walking a block at a reasonable pace on rough or uneven surfaces, using standard public transportation, climbing a few steps at a reasonable pace with the use of a single hand rail, preparing a simple meal and feeding himself, caring for personal hygiene, and sorting, handling, and using paper/files. (*Id*. at 313.) Dr. Dowling concluded that plaintiff's limitations lasted or would last for 12 consecutive months. (*Id*.)

On March 11, 2014, plaintiff saw Anthony Wong, M.D. for a skin examination. (*Id*. at 304-05.) Dr. Wong identified a basal cell carcinoma on plaintiff's face and recommended that plaintiff schedule Mohs surgery to remove it. Plaintiff agreed. (*Id*.)

On March 19, 2014, Dr. Wong performed a Mohs excision of a basal cell carcinoma on plaintiff's nose. (*Id*. at 302-03, 306-07.) In his report, Dr. Wong indicated that plaintiff tolerated the procedure well, and recommended that plaintiff return to Dr. Wong's office in one week. (*Id*. at 303.)

One week later, on March 26, 2014, plaintiff returned to Dr. Wong. (*Id*. at 300-01.) Dr. Wong indicated in his report that there were no concerns, and recommended that plaintiff return in four weeks. (*Id*. at 300.)

An April 4, 2014 MRI of plaintiff's cervical spine showed a C5/6 disc bulge with a right paramidline and right intraforaminal asymmetry, a C6/7 mild disc bulge, a C4/5 minimal bulge, and no focal left-sided disc herniation. (*Id*. at 173, 330-31.)

On May 2, 2014, plaintiff returned to Dr. Duffy for a psychological re-assessment of his level of functioning and need for treatment. (*Id*. at 332-36.) In her report, Dr. Duffy indicated that, during the session, plaintiff's level of consciousness was unimpaired, and his attention and concentration were not impaired. (*Id*. at 335.) She also indicated that plaintiff's mood was predominately one of moderate manifest depression, anxiety, and agitation. (*Id*.) Dr. Duffy stated that plaintiff experienced moderate to severe symptoms as a consequence of his work-related incident, including manifest depression, anxious irritable mood, increased stress and tension, insomnia, fatigue, as well as diminished self-esteem and emotional coping capability. (*Id*.) She added that, since his initial assessment, plaintiff's symptoms had increased in intensity, causing significant interference in his daily functioning, and attributed it to his declining health and chronic pain. (*Id*.) Dr. Duffy concluded that, due to the severity of his symptoms and their impact on his ability to focus and sustain attention, plaintiff was not capable of maintaining gainful employment in any capacity. (*Id*.) Dr. Duffy then stated that plaintiff would benefit from psychotherapeutic intervention, should attend individual therapy, should be referred to a psychiatrist to determine if he was a candidate for psychotropic medication, would benefit from stress management training and cognitive therapy focusing on interpersonal communication and problem solving skills, and should continue in marriage counseling. (*Id*. at 336.)

On June 3, 2014, Dr. Duffy completed a SSA Medical Source Statement of Ability to Do Work-Related Activities for plaintiff. (*Id*. at 337-40.) In the statement, she indicated that plaintiff had a mild restriction for understanding, remembering, and carrying out simple instructions; a moderate restriction for making judgments on simple work-related decisions; a marked restriction for understanding, remembering, and carrying out complex instructions; and a marked restriction for making judgments on complex work-related decisions. (*Id*. at 337.) Further, she indicated that plaintiff had a marked restriction for interacting appropriately with the public, supervisors, and co-workers, and a marked restriction for responding appropriately to usual work situations and changes in a routine work setting. (*Id*. at 338.) In an attachment, Dr. Duffy explained that, due to his chronic pain and severely depressed mood, plaintiff was easily distracted and had difficulty sustaining attention, and his impaired memory and concentration would interfere with recalling and carrying out simple tasks, but was more pronounced with complex tasks that require sustained attention and higher level thinking. (*Id*. at 340.) In the same attachment, Dr. Duffy also explained that, due to plaintiff's constant pain, he had great difficulty coping with his limitations, and was, thus, very irritable, easily frustrated and overwhelmed, depressed, and withdrawn, and would have difficulty managing daily stressors and functioning consistently in the work setting. (*Id*.)

C. Relevant Testimonial Evidence

During an administrative hearing held on June 18, 2014, plaintiff testified that he was 53 years old. (*Id*. at 344.) Plaintiff also testified that he was a high school graduate, completed two years of college, graduated from the fire academy, and had previously worked for FDNY. (*Id*.) Plaintiff indicated

that he worked for FDNY for 20 years and retired prematurely because of "a line of duty disability," that entailed complications with his right knee. (*Id*. at 345.) According to plaintiff, he had a host of orthopedic issues that had been ongoing for the past ten years, including complications with his neck, lower back, right knee, and left shoulder. (*Id*. at 345-46.)

Plaintiff testified that he was married with two sons. (*Id*. at 346.) He and his wife cared for their children and plaintiff's 83-year-old mother. (*Id*. at 346-47.) Plaintiff drove "locally," and could "sit for 10 minutes, 20 minutes, 30 minutes," depending on the condition of his lower back and neck. (*Id*. at 347.) Plaintiff testified that if he "gets into a different position every 20 minutes," then he was "able to get through the day with a minimum amount of pain." (*Id*.) Plaintiff added that remaining "in one place for an extended period of time" aggravated his lower back and neck. (*Id*.) Further, depending on the position of his neck, plaintiff said that either a few fingers or his whole hand would turn numb. (*Id*. at 347-48.) Plaintiff also testified that his doctors told him that he had "degenerative disc disease in the neck," it may "potentially get worse," and "surgical intervention" may be required at some point, but, at the moment, he needed to get "a series of cortisone injections into [his] neck." (*Id*. at 348.)

With respect to plaintiff's right knee, he testified that he could not use his knee at all until he had surgery, and "initially it was getting better," but after "rehab," he had come to terms with the fact that he could only walk in limited amounts and he had to be careful with what he did with his knee. (*Id*. at 348, 350.) Plaintiff testified that he could "walk up and down [his] block with [his] kids," but found it difficult to walk in shopping malls. (*Id*. at 357.) According to

plaintiff, he could not run, ride a bike, or climb stairs; however, he occasionally rode a recumbent bike. (*Id*. at 348-49.) Plaintiff indicated that he would typically ride the recumbent bike once in the morning and once in the afternoon for 5-15 minutes, depending on the condition of his knee and back. (*Id*. at 349.) Plaintiff also testified that, "depending on how [his] back is feeling," and, "depending on how [his] knee is positioned," he could sit for only 5-30 minutes at a time. (*Id*. at 356.)

With respect to plaintiff's left shoulder, he testified that it gave him "a lot of trouble" when he "tr[ied] to lay down at night." (*Id*. at 350.) Due to complications with his shoulder, back, and neck, plaintiff found it "very difficult to find the perfect [sleeping] position" to keep him from "waking up all night." (*Id*.) Plaintiff also testified that he only had "60-percent range of motion," and had experienced "a significant amount of loss of strength" in his shoulder. (*Id*. at 351.) According to plaintiff, he could "lift 20 pounds up." (*Id*. at 357.)

With respect to psychiatric issues, plaintiff testified that he saw a psychiatrist (*id*. at 351), but there is no evidence in the record supporting that claim. Plaintiff did see a psychologist, Dr. Duffy, who recommended that he see a psychiatrist "to determine if he is a candidate for psychotropic medication." (*Id*. at 191, 336.)[3] Nevertheless, according to plaintiff, prior to seeing Dr. Duffy, he realized that he "became somewhat antisocial," and, after seeing Dr. Duffy, he realized that when he was told he had to retire, "it created some depression." (*Id*. at 353-54.) Plaintiff also testified that he reported to the World Trade Center site around 10:00 a.m. on the

---

[3] Further, plaintiff did not report taking any psychotropic medications. (*Id*. at 133, 149-50, 159-60, 163-64, 171-72, 217, 223, 264, 273, 276, 300, 302, 304, 315, 318, 320, 323.)

morning of September 11, 2001 in his capacity as a firefighter, and spent "the better part of the first 30 days" following the attack at the World Trade Center site. (*Id*. at 354-55.) In his testimony, plaintiff stated that, "I didn't think that I had a problem with 9/11, but once I start[ed] to talk about it with Dr. Duffy and I guess she saw how upset I was getting, maybe that had more of an effect on me than I had realized at that time." (*Id*. at 354.)

Darren K. Flomberg ("Flomberg"), a vocational expert, (*id*. at 106-08), testified that plaintiff's past relevant work as a firefighter was categorized at a very heavy exertion level with a Skilled Vocational Preparation rating of six. (*Id*. at 358-59.)

The ALJ asked Flomberg to consider a hypothetical individual of the same age, work background, and educational background as plaintiff, who could occasionally lift 30 pounds and frequently lift 20 pounds; could sit, stand, or walk about six hours in an eight-hour day; could frequently climb and balance; could occasionally stoop, kneel, crouch, and crawl; would not have any limitations with reaching, handling, pushing, or pulling; would not have any visual communicative or environmental limitations; would be able to be accommodated by normal breaks; would be absent no more than one day per month; would have no restrictions of activities of daily living; would have mild difficulties in social functioning; would have no difficulty maintaining concentration, persistence and pace, or decompensation; could understand simple instructions, constantly respond to supervisors and co-workers in usual work situations, and deal with changes in the work setting; would be able to perform simple tasks, make simple decisions, and perform routine and repetitive tasks; would be able to understand, carry out, and remember complex instructions; would be able to

maintain concentration for extended periods; and would be able to perform activities within a schedule, maintain attendance, and be punctual. (*Id*. at 359-60.) Flomberg confirmed that such an individual would be able to perform work as a deli cutter/slicer, fast-food worker, or counter attendant. (*Id*. at 361-62.) Flomberg also confirmed that those jobs exist in sufficient numbers in both the local and national economy. (*Id*. at 361-63.)

The ALJ next asked Flomberg to consider a second hypothetical individual with the same limitations, except this individual could lift up to 20 pounds occasionally and up to 10 pounds frequently; could carry up to 20 pounds occasionally and up to 10 pounds frequently; could sit, stand, and walk for 30 minutes; and could sit, stand, and walk for two hours over an eight-hour period. (*Id*. at 363-64.) Flomberg confirmed that there would be no jobs for such an individual. (*Id*. at 364.)

The ALJ then asked Flomberg to consider a third hypothetical individual with the same limitations, except this individual could occasionally bend, reach, push, and pull with his hands; and could never climb ladders, balance, or crawl. (*Id*. at 364.) Flomberg confirmed that there would be no jobs for such an individual. (*Id*.)

The ALJ next asked Flomberg to consider a fourth hypothetical individual with the same limitations, except this individual could never be on unprotected heights; could occasionally understand and carry out complex instructions; could occasionally make judgments; could occasionally interact with the public, supervisors, and co-workers; could respond to usual work situations and changes in the work setting; would suffer from his attention and concentration being affected at least 20 percent of the time; and could not be on task 20 percent of the time. (*Id*.) Flomberg

confirmed that there would be no jobs for such an individual. (*Id*.)

## II. PROCEDURAL BACKGROUND

### A. Administrative History

Plaintiff filed an application for disability insurance benefits under Title II of the SSA on November 27, 2012, alleging disability as of August 19, 2010. (*Id*. at 48-49.) Plaintiff's application for disability insurance benefits was denied on June 24, 2013. (*Id*. at 62-69.) On July 1, 2013, plaintiff requested an administrative hearing, (*id*. at 70-72, 151), which was held on June 18, 2014 (*id*. at 81, 87, 102, 109, 111). After that hearing, the ALJ considered plaintiff's case *de novo* and issued a decision on July 23, 2014, finding that the plaintiff was not disabled under the SSA. (*Id*. at 8-20.) On September 20, 2014, plaintiff requested a review of the ALJ's decision by the Appeals Council because he was "unable to perform any substantial gainful activity." (*Id*. at 7.) On July 6, 2016, the Appeals Council denied plaintiff's request for a review. (*Id*. at 1-5.)

### B. The Instant Case

Plaintiff commenced this lawsuit on August 20, 2016. (ECF No. 1.) On April 17, 2017, plaintiff moved for judgment on the pleadings. (ECF No. 13.) The Commissioner submitted a cross-motion for judgment on the pleadings on June 30, 2017. (ECF No. 15.) On July 10, 2017, plaintiff replied to the Commissioner's cross-motion for judgment on the pleadings. (ECF No. 16.) The Court has fully considered the parties' submissions.

## III. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the

record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-375 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## IV. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Social Security Regulations establish a five-step procedure for determining whether a claimant is entitled to social security benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual function capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

In making these determinations, the Commissioner "must consider four factors:

'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's Ruling

At the first and second steps, the ALJ determined that plaintiff had proved that he had not engaged in substantial gainful activity since August 19, 2010, the alleged onset date of disability, and that he suffered from "severe impairments," namely, a history of right knee meniscal tear status-post surgical repair, left shoulder rotator cuff tear status-post surgical repair, neck and low back degenerative disc disease, and depressive disorder. (AR at 13.)

At step three, the ALJ determined that plaintiff's impairments did not fall under the list of impairments outlined in Appendix 1 of the regulations. (*Id.* at 13-14.)

At the fourth step, the ALJ found that plaintiff had the RFC to perform light work as defined in 20 CFR § 404.1567(b). (*Id.* at 14.) The ALJ found the following: plaintiff could lift/carry up to 30 pounds occasionally and 20 pounds frequently; sit, stand, and walk up to six hours in an eight-hour day; occasionally stoop, kneel, crouch and crawl; and frequently climb and balance. (*Id.*) Additionally, the ALJ noted that plaintiff could be absent no more than one day per month; frequently interact with supervisors, co-workers, and the general public; constantly respond to supervision, co-workers, and usual work situations; understand, remember and carry out complex instructions; and make simple work-related decisions. (*Id.*)

In reaching his conclusion, the ALJ considered all the symptoms and the extent

to which plaintiff's symptoms could reasonably have been accepted as consistent with the objective medical evidence, based on the requirements of 20 CFR § 404.1529 and Social Security Rulings ("SSR") 96-4p and 96-7p. (*Id*. at 15.) Additionally, the ALJ noted that he considered the opinion evidence in accordance with the requirements set forth in 20 CFR § 404.1527 and SSRs 96-2p, 96-5p, and 06-3p. (*Id*.)

In considering plaintiff's symptoms, the ALJ followed a two-step process. (*Id*. at 15.) The first step required the ALJ to determine if there was an underlying medically determinable physical or mental impairment. (*Id*.) The second step of the process then required the ALJ to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms. (*Id*.) The ALJ noted plaintiff's alleged pain due to multiple orthopedic injuries, as well as the alleged existence of emotional issues, including depression and post-traumatic stress disorder. (*Id*.) In applying the two-step process, the ALJ determined that plaintiff's "medically determinable impairments could [have] reasonably [been] expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." (*Id*.)

In support of his conclusion, the ALJ relied, to varying degrees, on the opinions of plaintiff's treating physicians, Dr. Cherney, Dr. Dowling, and Dr. Duffy. (*Id*. at 16-18.) The ALJ also relied on the opinions of the Medical Board, and consultative medical examiners Dr. Dutta and Dr. Acer, as well as plaintiff's medical records. (*Id*. at 15-18.)

The ALJ relied heavily on and gave the most weight to the opinion of Dr. Cherney, plaintiff's treating orthopedic specialist. (*Id*. at 16.) The ALJ noted in his opinion that plaintiff began treatment with Dr. Cherney

in 2009 due to complaints of pain in his right knee. (*Id*.) Dr. Cherney performed an arthroscopic meniscectomy and chondroplasty on plaintiff's right knee on November 24, 2009. (*Id*.) Approximately seven months later, in June 2010, Dr. Cherney stated that plaintiff continued to experience increasing pain and loss of function in his knee, despite surgery, and plaintiff's prognosis for return to full duty as a fire marshal was poor. (*Id*.) Dr. Cherney added that plaintiff would have difficulty climbing stairs, walking downhill, running, kneeling, and squatting. (*Id*.) Approximately three years after surgery, in 2012, Dr. Cherney noted that plaintiff could swim, bike, and do yoga; however, Dr. Cherney advised plaintiff to limit himself to minimal impact or no-impact sports. (*Id*.) Approximately five years after surgery, in February 2014, plaintiff continued to complain of ongoing pain and stiffness in his right knee with increased level of activity, yet plaintiff was still able to perform low impact fitness-type exercise. (*Id*.) Dr. Cherney advised plaintiff to refrain from all jumping or impact sport activity and heavy lifting. (*Id*.) The ALJ gave "significant weight" to the opinion of Dr. Cherney because it was "based on a treating relationship, and consistent with the course of treatment and [plaintiff's] reported activities." (*Id*.)

Although he acknowledged that plaintiff's orthopedic surgeon, Dr. Dowling, "had a treating relationship with" plaintiff, the ALJ did not rely heavily on Dr. Dowling's opinions. (*Id*.) The ALJ noted in his determination that plaintiff began treatment with Dr. Dowling in 2010 due to complaints of pain in his lower back and neck. (*Id*.) Dr. Dowling stated that plaintiff exhibited a normal range of motion of the lumbar spine without tenderness or spasm, and prescribed physical therapy. (*Id*.) Approximately two years later, in March

2012, plaintiff complained of neck pain radiating into his left shoulder and Dr. Dowling diagnosed plaintiff with cervical radiculopathy due to degenerative disc disease, and plaintiff's symptoms resolved shortly thereafter. (*Id*.) Approximately nine months later, in December 2012, plaintiff complained of exacerbated neck, back, and shoulder pain. (*Id*.) Dr. Dowling indicated that plaintiff had cervical spasms and, although his neck, back, and shoulder ranges of motion were normal, Dr. Dowling commented that plaintiff's impairment was "total." (*Id*.) Then, in February 2014, plaintiff complained of intermittent neck pain and Dr. Dowling noted that plaintiff had some tenderness, but a full range of motion without spasms. (*Id*.) Finally, in March 2014, Dr. Dowling assessed plaintiff, advising of various physical limitations. (*Id*.) The ALJ gave "limited weight" to the opinion of Dr. Dowling. (*Id*.) Although the ALJ stated that a treating relationship existed, he afforded little weight to Dr. Dowling's opinion because "treatment had been very sporadic and irregular," "the findings on examination have been essentially normal," and "the nature of treatment has been conservative and in no way support[s] the significant limitations imposed." (*Id*.)

The ALJ also did not rely heavily on the opinions of Dr. Duffy, plaintiff's treating psychologist. (*Id*. at 17-18.) The ALJ noted in his opinion that plaintiff presented to Dr. Duffy for a consultation in December 2012 due to multiple symptoms, including feelings of depression, anxiety, irritability, low frustration tolerance, and a diminished desire to socialize. (*Id*. at 17.) Dr. Duffy stated that plaintiff noted feelings of post-traumatic stress following September 11, 2001, but was still able to work, and was unable to perform at full capacity owing only to his physical injuries. (*Id*.) Dr. Duffy added that plaintiff's concentration and

attention were not impaired, and his mood exhibited moderate depression, anxiety, and agitation. (*Id*.) Dr. Duffy diagnosed plaintiff with major depression and post-traumatic stress disorder, and recommended psychotherapeutic intervention, stress management training, and cognitive therapy. (*Id*.) Approximately two years later, in May 2014, plaintiff returned to Dr. Duffy for a re-assessment, in which similar findings were made. (*Id*.) Dr. Duffy assessed plaintiff, advising of various mental function limitations. (*Id*. at 18.) Although the ALJ stated that a treating relationship existed and Dr. Duffy's findings were "based on a comprehensive mental status examination and [were] consistent with the weight of the evidence," the ALJ chose to accord "some weight" to the opinion of Dr. Duffy due to the course of the medical treatment and plaintiff's reported daily activities. (*Id*.)

The ALJ also relied on the opinions of the Medical Board. (*Id*. at 15-16.) The ALJ noted that plaintiff's application for accident disability was granted, but his application for disability retirement under the provisions of the WTC Program was denied due to insufficient evidence. (*Id*. at 15.) The ALJ also noted that the Medical Board advised that plaintiff "may engage in a suitable occupation." (*Id*. at 16.) The ALJ gave "some weight" to this opinion because it was based on plaintiff's medical history and his course of medical treatment, and was consistent with the weight of the evidence. (*Id*.)

The ALJ relied on the opinions of Dr. Dutta, a consultative orthopedist. (*Id*. at 17.) Dr. Dutta examined plaintiff on April 11, 2013. (*Id*.) The ALJ discussed the findings of Dr. Dutta's examination of plaintiff, and noted: plaintiff walked with a slight left limp, but was able to walk on his heels and toes without difficulty; cervical and lumbar spines exhibited limited range of motion

without pain or spasms; straight leg raising was negative; limited motion of the shoulder, with intact strength in the upper extremities; right knee had a slightly limited range of motion, with intact strength in the lower extremities; no evidence of diminished strength, muscle atrophy, sensory abnormality, or decreased reflexes; and no joint effusion, inflammation, or instability. (*Id*.) Dr. Dutta diagnosed plaintiff with the following: post repair supraspinatus tendon of left shoulder; post repair right shoulder subscapularis; post meniscectomy of right knee; history of GERD; post-traumatic stress disorder; history of depression; acid reflux; and degenerative disc disease from C2 through C7. (*Id*.) Dr. Dutta also assessed plaintiff, advising of some physical limitations. (*Id*.) Although Dr. Dutta only examined plaintiff on one occasion, the ALJ gave "some weight" to Dr. Dutta's opinion because the "findings [were] based on a comprehensive examination and [were] consistent with the weight of the evidence, the course of medical treatment, and [plaintiff's] reported daily activities." (*Id*.)

The ALJ relied on the opinion of Dr. Acer, a consultative psychologist. (*Id*. at 18.) Dr. Acer examined plaintiff on June 7, 2013. (*Id*.) The ALJ discussed the findings of Dr. Acer's examination of plaintiff, and noted that plaintiff's mental status examination was unremarkable, and his attention, concentration, and memory were intact. (*Id*.) Dr. Acer diagnosed plaintiff with mild adjustment disorder, and assessed plaintiff's mental functioning limitations, ultimately concluding that the results of the evaluation did not appear to be consistent with severe psychiatric issues that would hamper functioning. (*Id*.) Although Dr. Acer only examined plaintiff on one occasion, the ALJ gave "some weight" to Dr. Acer's opinion because the "findings [were] based on a comprehensive mental

status examination and [were] consistent with the weight of the evidence, the course of medical treatment, and [plaintiff's] reported daily activities." (*Id*.)

The ALJ also relied on testimony from a vocational expert who determined that plaintiff was unable to perform any past relevant work. (*Id*. at 19.) The vocational expert also determined that, based on plaintiff's age, education, work experience, and residual functional capacity, plaintiff would be able to perform the requirements of representative occupations such as: deli cutter slicer; fast food worker; and counter attendant. (*Id*. at 20.) The vocational expert also confirmed that such jobs exist in significant numbers in the national economy. (*Id*.)[4]

Upon considering all the medical evidence and testimony, the ALJ determined that plaintiff was not disabled under the SSA. (*Id*. at 19-20.) Consequently, the ALJ determined that plaintiff did not qualify for disability benefits.

C. Analysis

Plaintiff challenges the Commissioner's decision that he is not disabled on several grounds. Specifically, plaintiff asserts that: (1) the ALJ erred in failing to afford controlling weight to the opinions of Dr. Dowling, plaintiff's treating physician; (2) the ALJ's determination that plaintiff had the RFC to perform light work was not based on substantial evidence; (3) the ALJ failed to properly evaluate plaintiff's credibility; and (4) the Commissioner failed to sustain her burden of establishing that

---

[4] As discussed more fully *infra*, the ALJ also gave "some weight" to opinion evidence from the "State agency physical consultant." (*Id*. at 18.) However, no state agency physical consultant provided an opinion in this case. The parties dispute whether the ALJ was referring to SDM Knight or Dr. Graff.

there is other work in the national economy that plaintiff can perform.

As set forth below, the Court concludes that the ALJ's failure to afford controlling weight to Dr. Dowling's opinions or provide sufficient reasons for declining to do so warrants remand under the treating physician rule. Accordingly, the Court remands this case to the ALJ for further proceedings. Additionally, as explained below, the ALJ is instructed to clarify on remand whether, and to what extent, he relied on SDM Knight's RFC assessment.

### 1. The Treating Physician Rule

Under the treating physician rule, an ALJ must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 119. Specifically, the treating physician rule "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g., Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).[5]

---

[5] The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

If an ALJ does not give controlling weight to a treating physician's opinions, he must "give good reasons in his notice of determination or decision" for the weight given to those opinions. *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *see also, e.g., Perez v. Astrue*, No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."). Further, the ALJ must apply various factors to decide how much weight to give the treating physician's opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. "[W]hen an ALJ does not give controlling weight to a treating physician's opinion, it must be clear from the decision that the ALJ considered the factors articulated in the Social Security Regulations for determining what weight to assign to a treating physician's opinion." *Vlado v. Berryhill*, No. 16-CV-794 (MKB), 2017 WL 1194348, at *9 (E.D.N.Y. Mar. 29, 2017). A failure by the ALJ to provide "good reasons" for not giving controlling weight to a treating physician's opinions is a ground for remand. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

---

> evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the Court concludes that the ALJ did not provide sufficient reasons for declining to afford controlling weight to Dr. Dowling's opinions under the treating physician rule. As noted above, the ALJ gave "limited weight" to Dr. Dowling's opinion because (1) "treatment had been very sporadic and irregular;" (2) "the findings on examination ha[d] been essentially normal;" and (3) "the nature of treatment ha[d] been conservative and in no way support[ed] the significant limitations imposed." (*Id.* at 16.) Notably, the ALJ did not find that Dr. Dowling's opinion was contradicted by another medical opinion. Thus, there must have been "overwhelmingly compelling evidence" to overcome Dr. Dowling's opinions. *E.g.*, *Giddings v. Astrue*, 333 Fed. App'x 649, 652 (2d Cir. 2009) (citing *Burgess*, 537 F.3d at 129). For the following reasons, the Court concludes that none of the ALJ's proffered reasons for affording limited weight to Dr. Dowling's opinion, either individually or cumulatively, satisfy the treating physician rule.

The ALJ's first reason for giving limited weight to Dr. Dowling's opinion was that "treatment had been very sporadic and irregular." This conclusory assertion does not satisfy the treating physician rule. *See, e.g.*, *Shaw*, 221 F.3d at 134 (concluding that the ALJ's rejection of a treating physician's opinion because of "the intermittent nature of [plaintiff's] treatment" was improper, and "f[ell] far short of the standard for contradictory evidence required to override the weight normally assigned the treating physician's opinion"); *Valerio v. Comm'r of Soc. Sec.*, No. 08-CV-4253 (CPS), 2009 WL 2424211, at *12 (E.D.N.Y. Aug. 5, 2009) (holding that a "conclusory assessment of [the treating physician's] relationship with plaintiff as sporadic in determining that [the physician's] opinion was unsupported by medical evidence amounts to an improper

application of the treating physician rule"); *Black v. Barnhart*, No. 01-CV-7825 FB, 2002 WL 1934052, at *4 (E.D.N.Y. Aug. 22, 2002) ("The ALJ incorrectly disregarded Dr. Leva's testimony because she apparently believed he treated Black too sporadically in 1998. This conclusory analysis does not satisfy the treating physician rule."). Indeed, the ALJ's conclusion fails to consider the fact that Dr. Dowling examined plaintiff over a four-year period, and was thus able to "develop a longitudinal picture of [p]laintiff's medical history and impairments" as envisioned by the treating physician rule. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Moreover, "whether [a p]laintiff sought medical treatment on a regular basis [should] not weigh against [that p]laintiff if the ALJ never asked [him or her] about the reason for [his or] her infrequent medical treatment." *See, e.g.*, *Vlado v. Berryhill*, No. 16-CV-794 (MKB), 2017 WL 1194348, at *11 (E.D.N.Y. Mar. 29, 2017) (collecting cases). At no point during the hearing did the ALJ ask plaintiff about the frequency of his visits to Dr. Dowling.[6] Thus, the ALJ's conclusory assertion, that giving limited weight to Dr. Dowling's opinion was justified because "treatment had been very sporadic and irregular," fails to satisfy the treating physician rule.

The second ground the ALJ invoked to support his decision to afford Dr. Dowling's opinion limited weight was that "the findings on examination ha[d] been essentially normal." (AR at 16.) However, an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Shaw*,

---

[6] "[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Vlado*, 2017 WL 1194348, at *9 (collecting cases).

221 F.3d at 134; *see also, e.g.*, *Morgan v. Colvin*, 592 F. App'x 49, 49 (2d Cir. 2015) ("The ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." (quoting *Rosa*, 168 F.3d at 79)). Dr. Dowling did not report "normal" findings after examining plaintiff. To the contrary, over the four years that Dr. Dowling treated plaintiff, he, *inter alia,* diagnosed plaintiff with mechanical discogenic low back pain and an underlying herniated disc at L4-5 and L5-S1 (AR at 315-16); diagnosed plaintiff with cervical radiculopathy due to underlying degenerative disc disease leading to foraminal stenosis of the cervical spine and concluded that plaintiff's impairment was "total" (*id.* at 316, 317, 322, 324); and concluded that plaintiff could sit, stand, and walk for only thirty minutes at a time (*id.* at 309). Thus, the ALJ impermissibly substituted his own opinion for Dr. Dowling's when he determined that Dr. Dowling's findings were "essentially normal." *See, e.g.*, *Shaw*, 221 F.3d at 134; *Jakubowski v. Berryhill*, No. 15-CV-6530 (CJB), 2017 WL 1082410, at *15 (E.D.N.Y. Mar. 22, 2017).

The ALJ's third reason for giving limited weight to Dr. Dowling's opinion— that "treatment ha[d] been conservative"— similarly fails to satisfy the treating physician rule. In *Shaw*, the Second Circuit instructed that it was improper for an ALJ to "characterize[] the fact that [the treating physician] recommended only conservative [treatment] as substantial evidence that plaintiff was not physically disabled." 221 F.3d at 134. The Court held that, by doing so, the ALJ improperly "imposed the[] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered." *Id.* at 134-35. Here, the ALJ similarly erred in concluding that the conservative nature of Dr. Dowling's

treatments was reason to afford limited weight to his opinions. *See id.*; *see also, e.g.*, *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Nor is the opinion of the treating physician to be discounted merely because he has recommended a conservative treatment regimen."); *Clarke v. Colvin*, No. 15-CV-354, 2017 WL 1215362, at *8 (S.D.N.Y. Apr. 3, 2017) (same). Moreover, the ALJ failed to consider, or ask plaintiff about, potential reasons that his treatment was conservative. *See, e.g.*, *Sickler v. Colvin*, No. 14 Civ. 1411, 2015 WL 1600320, at *15 (S.D.N.Y. Apr. 9, 2015); SSRs 16-3p (listing potential reasons that a prescribed treatment may seem conservative, including that a plaintiff may not be able to afford more progressive treatment, may not have access to low-cost services, and may not agree to take more potent prescription medications).[7]

Finally, there is no indication in the record that the ALJ considered the fact that Dr. Dowling is a specialist in deciding to afford limited weight to his opinion. Remand is warranted when the ALJ has not indicated what weight, if any, was assigned based on the fact that the medical opinion was from a specialist. *See, e.g.*, *Clark*, 2016 WL 1254024, at *10 (collecting cases). Moreover, the ALJ gave "limited weight" to Dr. Dowling's opinion while affording "some weight" to Dr. Dutta's opinion. Dr. Dowling, who examined plaintiff over the course of four years, is an orthopedic surgeon specialized in treating lower back and neck pain. Dr. Dutta, on the other hand, is a consultative orthopedist who examined

---

[7] In fact, plaintiff reported that his "daily medications affect [his] ability to stay focused" and "seem to have a negative impact on [his] memory." (AR at 149-50.) There is no indication that the ALJ considered this in determining that Dr. Dowling's opinion was not entitled to controlling weight because plaintiff's treatment was conservative in nature.

plaintiff once. "[A]n opinion of a specialist regarding medical issues related to his or her area of specialty must be given more weight than the opinion of a source who is not a specialist." *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011); *see also Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 508 (S.D.N.Y. 2014) ("An ALJ should 'generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.'" (quoting 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5))). Thus, the ALJ's failure to consider that Dr. Dowling is a specialist, particularly in light of the fact that the ALJ gave more weight to Dr. Dutta's opinion, requires remand.[8]

In sum, the ALJ failed to provide "good reasons" for declining to afford controlling weight to Dr. Dowling's opinions. *Snell*, 177 F.3d at 133. That failure "by itself warrants remand." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013).

### 2. Single Decisionmaker RFC Assessments

Although the ALJ's failure to satisfy the treating physician rule independently warrants remand, the Court also addresses an additional deficiency in the ALJ's determination, which the ALJ should address on remand. In his opinion, the ALJ stated,

> With regard to additional opinion evidence, some weight is afforded to the State agency physical consultant's assessments (Exhibit 1A, 5F, 7F, 9F); however, they did not get an opportunity to examine the claimant. As such, these opinions are weighed as statements from non-examining expert sources, as they are highly qualified physicians who are also experts in Social Security disability evaluation (20 CFR 404.1527).

(AR at 18). However, no state agency physical consultant provided an assessment in this matter. The parties dispute to whom the ALJ's above statements refer. Plaintiff argues that the statements refer to SDM Knight, who provided a state agency RFC assessment, and that the ALJ erred in placing any weight on an RFC assessment from an SDM. The Commissioner contends that the statements refer to Dr. Graff, the state agency psychological consultant, and that, even if the statements refer to SDM Knight, the ALJ's reliance on SDM Knight's RFC assessment was harmless error.

"SDMs are non-physician disability examiners who 'may make the initial disability determination in most cases without requiring the signature of a medical consultant.'" *Lozama v. Colvin*, No. 1:13-CV-0020(GTS), 2016 WL 1259411, at *5 (N.D.N.Y. Mar. 30, 2016) (quoting *Hart v. Astrue*, 32 F. Supp. 3d 227, 237 (N.D.N.Y. 2012)). Because SDMs are not medical professionals, courts have concluded that an SDM's RFC assessment is "entitled to no weight as a medical opinion." *See, e.g.*, *Buono v. Colvin*, No. 14-CV-2388 FB, 2015 WL 4390645, at *2 (E.D.N.Y. July 15, 2015); *Box v. Colvin*, 3 F. Supp. 3d

---

[8] The Court notes that it also appears that the ALJ did not rely on the opinion of Dr. Kerker, who consistently treated plaintiff for his left shoulder injury from April 2012 to April 2013. During that time period, plaintiff visited Dr. Kerker approximately nine times, and Dr. Kerker performed arthroscopic surgery on plaintiff. Although the ALJ described Dr. Kerker's treatment of plaintiff (*id.* at 17), he did not clearly state whether he relied on Dr. Kerker's opinion, and, if so, to what extent. On remand, the ALJ is instructed to clarify whether, and to what extent, he relied on Dr. Kerker's opinion and explain his reasons for doing so (or declining to do so), consistent with this Memorandum and Order.

27, 46 (E.D.N.Y. 2014); *Kociuba v. Comm'r of Soc. Sec.*, No. 5:16-CV-0064, 2017 WL 2210511, at *7 (N.D.N.Y. May 19, 2017) (citing *Robles v. Comm'r of Soc. Sec.*, No. 5:15-CV-1359, 2016 WL 7048709, at *5 (N.D.N.Y. Dec. 5, 2016)). It is thus legal error to weigh an SDM's opinion as if he or she were a medical professional. *See, e.g.*, *Box*, 3 F. Supp. 3d at 46.

After reviewing the ALJ's at-issue statements and the exhibits referenced therein, the Court concludes that it is not clear whether the ALJ's statements refer to SDM Knight's RFC assessment. However, the Court notes that the ALJ's findings and conclusions regarding plaintiff's RFC to perform light work are closely aligned with SDM Knight's opinions. It thus appears that the ALJ may have afforded improper evidentiary weight to SDM Knight's opinions in determining that plaintiff had the RFC to perform light work.[9] Accordingly, the ALJ should clarify on remand the weight, if any, given to SDM Knight's RFC assessment, consistent with this Memorandum and Order.[10]

## V. CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings is denied. The Commissioner's cross-motion for judgment on the pleadings is also denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

███████████

JOSEPH F. BIANCO
United States District Judge

Dated: February 14, 2018
Central Islip, New York

\*\*\*

Plaintiff is represented by Sharmine Persuad of the Law Office of Sharmine Persuad, 1105 Route 110, Farmingdale, NY 11735. The Commissioner is represented by Assistant United States Attorney Mary M. Dickman, 271 Cadman Plaza East, Brooklyn, NY 11201.

---

[9] Because it is unclear whether, and to what extent, the ALJ relied on SDM Knight's RFC assessment, the Court cannot determine whether any such reliance was harmless.

[10] In light of this Court's conclusion that the ALJ committed legal error by failing to give "good reasons" for giving limited weight to Dr. Dowling's opinions, the Court need not address plaintiff's other arguments. However, after a proper application of the treating physician rule, the ALJ shall reassess the credibility determination of plaintiff, as well as the determination as to whether plaintiff had the RFC to perform light work and whether there is other work in the national economy that plaintiff can perform.